**BIOSONIX, LLC, Plaintiff,**

v.

**HYDROWAVE, LLC, T–H Marine Supplies, Inc., and RHP Industries, LLC, Defendants.**

**CIVIL ACTION No. 4:16–cv–139**

United States District Court,
E.D. Texas, Sherman Division.

Signed 01/17/2017

Bobby Wayne Braxton, Gregory Perrone, Braxton, Hilton & Perrone, PLLC, Plano, TX, Steven Tepera, Reed & Scardino LLP, Austin, TX, for Plaintiff.

Jeffrey Lee Crouch, Culhane Meadows, PLLC, Dallas, TX, James Douglas Uloth, Uloth, PC, Addison, TX, Russell Brandon Bundren, Bradley Arant Boult Cummings LLP, Nashville, TN, Stephen Hamilton Hall, Bradley Arant Boult Cummings LLP, Huntsville, AL, for Defendants.

## ORDER CONSTRUING CLAIM TERMS OF UNITED STATES PATENT NO. 7,333,395

Ron Clark, United States District Judge

Plaintiff Biosonix, LLC filed suit against Defendants Hydrowave, LLC, T–H Marine Supplies, Inc., and RHP Industries, LLC ("Defendants") claiming infringement of United States Patent No. 7,333,395 ("the '395 patent"). The court conducted a *Markman* hearing to assist in interpreting the meaning of the claim terms in dispute.[1] Having carefully considered the patent, the parties' contentions as presented in their briefs, and the arguments of counsel, the court now makes the following findings and construes the disputed claim terms.

## I. CLAIM CONSTRUCTION PRINCIPLES

▪ Claim construction is a matter of law. *Markman v. Westview Instruments, Inc. (Markman II)*, 517 U.S. 370, 388–91,

116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). "Because the patentee is required to define precisely what his invention is, ... it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *White v. Dunbar*, 119 U.S. 47, 52, 7 S.Ct. 72, 30 L.Ed. 303 (1886) (internal quotations omitted)).

▪ Words in a claim are generally given their ordinary and customary meaning as understood by a person having ordinary skill in the art in question as of the effective filing date of the patent application. *Phillips*, 415 F.3d at 1313. However, a patentee may demonstrate an express intent to impart a novel meaning by redefining a term "with reasonable clarity, deliberateness, and precision" in the patent specification or prosecution history. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

▪ A patentee may also limit scope by an express disclaimer or disavowal through the specification or prosecution history. *Phillips*, 415 F.3d at 1316. "A specification may only be used to limit a claim if a patentee has disavowed or disclaimed scope of coverage by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1377 (Fed. Cir. 2003) (citing *Teleflex*, 299 F.3d at 1325). Similarly, disavowal through prosecution history, sometimes referred to as prosecution disclaimer, must be clear, unmistak-

---

1. At the December 5, 2016 *Markman* hearing, the parties made certain representations and their experts agreed upon the answers to a number of technical questions from the court, not all of which will be repeated here, but which may assist in understanding the issues presented. The official transcript of that hearing is located at Dkt. 78 and citations to the transcript appear as "Tr. at ——." Court's Exhibit Nos. 1–13 were displayed and discussed at the hearing and are filed in the record at Dkt. 73–1. These exhibits will be cited as "Ct.'s Ex. ——." In the event there is a conflict between this Order and any of the court's preliminary analysis at the *Markman* hearing, this Order governs.

able, and unambiguous. *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

■■■ The intrinsic evidence, that is, the patent's specification and, if in evidence, the prosecution history, is important in claim construction. *Phillips*, 415 F.3d at 1315–17. A court may also review extrinsic evidence, such as dictionaries, inventor testimony, and learned treatises. *Id.* at 1317. However, extrinsic evidence should be considered in the context of the intrinsic evidence in order to result in a reliable interpretation of claim scope. *Id.* at 1319.

## II. PATENT BACKGROUND AND TECHNOLOGY

The '395 patent was filed on May 18, 2006, and issued on February 19, 2008. The '395 patent is directed toward a system, method, and apparatus for attracting fish by playing a user-selected program of one or more sets of prey-attacking sounds underwater. The use of auditory signals to attract marine life has been well known in the art for some time. However, Plaintiffs claim that the systems and methods in the '395 patent offer a novel approach to attracting fish through sound by allowing users, through a user-input device, to make customized selections of sounds to be played and various settings for those sounds. All of the terms that the parties have requested the court to construe are found in claims 4 or 13 of the '395 patent.

## III. PERSON HAVING ORDINARY SKILL IN THE ART

■■■ Neither party proposed a definition of a person having ordinary skill in

the art in question ("PHOSITA"). Based on the technology described in the patent, the references cited as examined by the PTO examiners, the arguments made by the parties at the *Markman* hearing, the qualifications of the inventor of the '395 Patent, and the qualifications of others in the inventor's field,[2] the court proposed the following definition:

> A person having ordinary skill in the art related to the technology of the patent is someone with the equivalent of a "four-year" degree from an accredited university (usually denoted in this country as a B.S. degree) in:
>
> 1. an engineering or scientific field that includes the study and/or use of electronic equipment that records, monitors, and transmits waves of various frequencies, plus some study of and experience with, or significant experience with, the habits and feeding patterns of game fish; or in
>
> 2. a fishery, wildlife management, or marine research field that includes the study of game fish, plus some study of and experience with, or significant experience with, electronic equipment that records, monitors, and transmits waves of various frequencies.

Advanced education could substitute for some experience, while additional training and significant experience could substitute for formal college education.

Ct.'s Ex. 1. Plaintiff agreed to this definition without objection. *See* Tr. at 7:18–20.

---

**2.** For example, Steven P. Holt, the inventor of the '891 and '858 patents cited in the file history, has a degree in Engineering and co-authored a book on fishing technologies with Mark Komenek, who has a B.S. degree in fisheries and wildlife management and twenty-five years of experience in the fisheries industry. Bill Lewis, the inventor's father, mentioned in Plaintiff's technology synopsis as the inventor of the ubiquitous "Rattletrap" line of lures, had a college degree and some forty plus years of experience in the fishing lure business.

Defendants, having failed to provide any proposal for a PHOSITA in their brief, objected to the court's definition because according to them, a PHOSITA need not have studied or had experience with habits and feeding patterns of game fish. Tr. at 7:22–8:3. However, the level of skill in the art is to be defined in the context of the subject matter to which the invention pertains. The purpose of the relevant technology is to attract game fish. It seems implausible that an individual with a Bachelor's degree in any engineering field who has neither studied nor gained some practical experience concerning marine life would qualify as a PHOSITA in the field of the art in question, which is the field of electronic fish-attracting devices.

To preclude study of, or experience with, game fish from the definition would not serve the purpose of defining PHOSITA, which is to provide a "prism or lens through which a judge [or] jury ... views the prior art and the claimed invention." *Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001).

For the reasons set out above and at the hearing, the court overrules Defendant's objections and adopts the definition set out above. *See* Tr. at 9:12–10:22 (discussing court's reasoning and likely ruling); Ct's Ex. 1.

## IV. CLAIM CONSTRUCTION

### A. Undisputed Term: "prerecorded sounds"—'395 Patent claims 4 and 13

The parties agreed to the following construction of the term "prerecorded sounds," a term which appears in both claims 4 and 13:

**3.** A similar approach is taken in the Local Patent Rules for the Northern District of California, which require parties to identify only

**"prerecorded sounds"** means **"recorded previously."**

*See* Tr. at 10:23–11:11 (discussing Ct.'s Ex. 2). This definition comports with the ordinary use of the term and the intrinsic evidence. It will be adopted by the court.

### B. Disputed Terms

The parties initially proposed 17 terms for construction, some for which only Defendants sought construction. *See* Dkt. 57. Of those 17 terms, there were only five terms that the parties agreed required construction. To encourage the parties to identify terms that were actually material to issues of invalidity or infringement, the court required the parties to streamline the list to eleven terms.[3] *See* Dkt. 59, at p. 2. If the parties could not agree on eleven terms, the court allowed each side to propose construction of three additional terms in addition to those five that were clearly in dispute. *See* Dkt. 59, at p. 2. Ultimately, the parties agreed that construction was necessary for those five terms, and only Defendants—through their supplemental statement and their brief—submitted additional terms for construction. *See* Dkt. 60.

### 1. "programmable control unit"—'395 Patent, claim 4

This term appears only in claim 4, which states in part (disputed term in bold):

a **programmable control unit** operably linked to said submersible device, said **programmable control unit** comprising . . .

 a processor;

 a memory device operably connected to said processor, for storing . . . ; and

 an input device including a user interface comprising a plurality of user-selectable options . . . .

10 terms for construction. *See* N.D. Cal. Local Rule 4–3(c).

'395 Patent, 20:41–60. Each party submitted a proposed construction, but none of the briefs explicitly addressed the fact that "programmable control unit" is a comprising term, for which the claim language explicitly describes the required elements. At the *Markman* hearing, the parties agreed that the term is a comprising term. Tr. at 12:11–18. And despite initially proposing a construction, Plaintiff agreed at the hearing that construction of this term was not required. Tr. at 19:17–20:22.

Defendants, however, insist that a construction is required to resolve a dispute as to what the term "programmable" means. Tr. at 14:7–17, 15:1–16. According to Defendants, "programmable" means that the control unit must be configured to accept instructions.[4] But Defendants could not explain how substituting their proposed forty-four word proposal for the three-word claim term would provide clarity not redundancy. Tr. at 15:17–19:3 (court and Defendant's counsel discussing Defendant's proposal).

As set out above, claim 4 teaches that the "programmable control unit" is comprised of at least three elements: a processor, a memory device, and an input device. Neither party raised any question or dispute over the meaning of "processor," which is a well-known term in the field of electronics. *See* STEVE M. KAPLAN, WILEY ELECTRICAL AND ELECTRONICS ENGINEERING DICTIONARY 605 (2004). The memory device and the input device are described in some detail within claim 4 itself. *See* '395 Patent, 20:41–60.

 "[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). This court is simply not required to rewrite the limitations of a comprising term that is already defined in substantial detail within a claim. When the meaning "is clear in the context of the claim" and "will be readily understandable to the jury," construction of a term is not necessary, particularly when the court addresses the concerns of the party seeking construction with other claim terms. *SFA Sys., LLC v. 1–800–Flowers.com, Inc.*, 940 F.Supp.2d 433, 442 (E.D. Tex. 2013) (citing *O2 Micron Int'l*, 521 F.3d at 1362).

In the present case, Defendants argue that there is a material dispute as to the degree of user configuration of, and/or required input around, the input device. But this Order construes separately a number of the terms used to describe the elements of the programmable control unit, for example, the construction of "custom program," which is part of the description of "input device." *See infra* Section B.3. At the *Markman* hearing, Defendants conceded that their dispute overlaps with the construction of other terms that the court is construing. Tr. at 15:1–16.

 Accordingly, the court declines the invitation to rewrite claim 4 so as to redefine **"programmable control unit,"** a comprising term with three elements, which are already described by no fewer than 130 words in claim 4 itself.

### 2. "transducer element"[5]—'395 Patent, claim 4

This term appears in claim 4, which states in part (disputed term in bold): "a

---

4. Defendants concede that they are not referring to "programmable" in the context of machine language or computer code programming. Tr. at 23; Tr. at 25:19–24.

5. In the analysis of this term one must distinguish "element" used generally in patent law to refer to a limitation of an apparatus claim and "element" as used in this claim term, which refers to the component that converts one form of energy to another.

submersible device comprising **a transducer element** disposed within a watertight housing." '395 Patent, 20:38–39.

For this construction, Plaintiff proposed: "a component of a device that converts sound from an electronic signal." Dkt. 61, at p. 12.

Defendants suggested: "a component that converts electrical energy to sound and sound to electrical energy. For example, a component that converts electrical energy to electrical energy, like a transformer, is not a transducer element." Dkt. 64, at p. 33.

At the *Markman* hearing, Plaintiff's technical experts, Mr. Robert Akl and Defendants' expert, Mr. Joe McAlexander, and in some cases the parties themselves, agreed on a number of facts. Based on these agreements and the specification of the patent itself, the court makes the following findings of fact, which would be known and understood by a PHOSITA as of the date of the invention:

1. The term "transducer" can refer to two categories of things: (1) what the court referred to as an "out-of-the-box" transducer that one can purchase at a sporting goods counter such as those at stores like Academy Sports or Walmart, and that typically has a half egg-like shape, and is usually covered or contained in some sort of plastic or epoxy material; or (2) what the court referred to as a "scientific" transducer, i.e. the electronic component with piezoelectric properties, such as the piezoelectric crystal or ceramic component, that actually converts one type of energy to another. *See* '395 Patent, 10:15–17; *see also* Tr. at 27–29.

2. The "transducer element" is the actual component that converts the energy, i.e. performs the "transducing." Tr. at 29:22–30:17.

3. The out-of-the-box transducer may have other elements besides the transducer element, i.e. sensors to determine the clarity, temperature, turbidity, etc. of the water, and or trolling speed. *See* '395 Patent, 3:31–37; *see also* Tr. at 30–31.

4. The only types of transduction asserted in the claims of the '395 patent are the conversion of electrical energy to acoustic energy, for example as in a speaker, and the conversion of acoustic energy to electrical energy, an example of which would be a hydrophone. *See, e.g.,* '395 Patent, 3:31–37; *see also* Tr. at 32:1–20.

5. Figure 4B of the '395 patent, which includes an illustration of a piezo element **410** and a diaphragm **415**, is a diagram of a "transducer device" **115**. *See* Tr. at 33; *see also* '395 Patent, 10:13–18. (This is the "out of the box" transducer.)

6. Figure 4B, because it contains both a piezo element and a diaphragm, might also be called a "speaker." *See* '395 Patent, 9:62–10:31 (discussing speaker embodiment); *see also See* STEVE M. KAPLAN, WILEY ELECTRICAL AND ELECTRONICS ENGINEERING DICTIONARY 732 (2004); *see also* Tr. at 33.

7. The transducer element that converts electrical energy to acoustical energy must be in something watertight. Defendant's expert agreed to this. Tr. at 54:8–21. Plaintiff did not dispute this.

Despite the experts' agreement on these facts, the parties still dispute two aspects of this term: (1) whether a "transducer element" must, in addition to having the ability to convert electrical energy to acoustical energy, be capable of also converting acoustical energy to electrical energy, i.e. operating as, or part of, a hydrophone, and (2) whether the "transducer element," or more, must be within the

watertight housing referenced in asserted claim 4 (*see* '395 Patent, 20:39–40). The court will address each dispute in turn.

### a. Whether a "transducer element" must be capable of converting acoustical energy to electrical energy

The parties agree that a "transducer element" must be capable of converting electrical energy to acoustical energy. *See* Dkt. 64 (Defs.' brief), at p. 35; Dkt. 61 (Pl.'s brief), at p.12. This capability is utilized when the "out-of-the-box" transducer functions as a speaker. Defendants also argue that a "transducer element," as recited in claim 4, must have the additional capability of converting acoustical energy to electrical energy, as would occur in a hydrophone. But Defendants do not adequately explain why the principle of claim differentiation is not applicable or why this limitation should be imported into claim 4.

The construction canon or guidepost known as claim differentiation teaches that two claims of a patent are presumptively of different scope. *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1366–67 (Fed. Cir. 2000). In other words, "different words or phrases used in separate claims ... indicate that the claims have different meanings and scopes." *Seachange Int'l, Inc. v. C–COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). Though the principle of claim differentiation is "at its strongest" between independent and dependent claims, "the presumption that two independent claims have different scope when different words or phrases are used" applies even when comparing two independent claims, as is the case here. *See Seachange*, 413 F.3d at 1368–69 (citing *Kraft Foods*, 203 F.3d at 1365).

Claims 1 and 45 both explicitly claim speaker and hydrophone capabilities. Claim 1 states in part: "said first trans-

ducer element is selectively operable as *either a speaker or a hydrophone* in response to control signals." '395 Patent, 20:1–4 (emphasis added). Claim 45 states in part: "a submersible device comprising multiple transducer elements disposed within a watertight housing and adapted to *play and record* underwater sounds in multiple directions." '395 Patent, 23:33–36 (emphasis added).

Claim 4 omits any teaching of, or reference to, hydrophone capability or the recording of underwater sounds. Applying the rule of claim differentiation creates a presumption that claim 4 has a different scope than either claim 1 or claim 45 and does not include a hydrophone or sound recording limitation.

Like other canons of construction, claim differentiation is not set in stone. Defendants argue that the patent describes the invention as having both recording and playback capability, pointing to statements in the specification such as the following:

> Underwater playback is achieved by use of a submersible transducer device which *may* function as both a speaker and a hydrophone.

'395 Patent, 2:37–39 (emphasis added).

The problem for Defendants here is that "may" is permissive, and the sentence merely describes possible capabilities of one or more embodiments. This provides no basis to import the dual-capacity limitation from the specification to claim 4. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346–47 (Fed. Cir. 2015) (holding that it was improper to import limitations from the specification, which disclosed examples and embodiments that were so limited, because "nowhere [did] the specification limit the graphical display to those examples or embodiments.").

The second passage cited by Defendants, which also contains the permissive "may," is likewise unavailing:

> The *present invention* also provides several unique advantages over the prior art relating to systems, methods, and devices for improved attraction and stimulation. In addition to the *speaker/hydrophone capability*, the submersible transducer device provided by the present invention *may* include additional functionality."

'395 Patent, 3:29–34 (emphasis added).

Defendants argue that because the specification references both speaker and hydrophone capabilities in describing "the present invention" and describes that limitation as one of the unique advantages over the prior art, that limitation must limit all of the claim terms, including claim 4. In support, Defendants cite *GPNE Corporation v. Apple, Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016), which is distinguishable. Tr. at 17–25.

In *GPNE*, the Federal Circuit affirmed the district court's construction of the term "node" as "*pager* with two-way data communication capability ... that *operates independently from a telephone network.*" 830 F.3d at 1371 (emphasis added). The patentee complained of the inclusion of the two limitations in italics. The court justified the construction by reasoning that "the specification repeatedly and exclusively uses" the words "pager" and "pager units" to refer to the devices in the patented system, and that "pager" and "pager units" were used some 200 times in the specification. *Id.* at 1370. The "operates independently" limitation was found to be properly included even though it appeared only once in the specification because that reference was included in a "summation sentence" from the specification that described the invention as a whole. *Id.* at 1371. The construction was also "bolstered by the prosecution history," wherein the

inventor's declaration explicitly stated that the invention was limited in both the ways that are italicized. *Id.*

■ ■ In contrast, the specification in the present case describes some embodiments with speaker capabilities and others with speaker and hydrophone functions. In addition to the two sentences quoted above, the specification repeatedly distinguishes between the capabilities. *See* '395 Patent, 10:30–56; *id.* at 4:31–36; *id.* at 10:57–59. Even where a specification mentions a certain limitation in a sentence referring to "the present invention" or "the invention," a court must not read that limitation as applying to each and every claim when other portions of the intrinsic evidence suggest otherwise. *See, e.g, Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008).

To the same effect is the holding in *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1326 (Fed. Cir. 2008). In *Praxair*, there were statements in the "Summary of the Invention" section of the patent that suggested that a certain limitation applied to the inventions overall. The Federal Circuit rejected reading in the limitation in construing a claim term, because there were "express statements" in the specification that clearly indicated that the limitation was only a feature of certain, and not all, embodiments. *See* 543 F.3d at 1306 (discussing the uniformity limitation to the term "capillary").

Defendants also stress that '395 Patent at Column 3, lines 29 through 34 combines "the present invention" with "speaker/hydrophone capability." This argument ignores the fact that standard usage of the slash as it appears in "speaker/hydrophone capabilities" more commonly indicates alternatives—not a combination. THE CHICAGO MANUAL OF STYLE 339–40 (16th ed. 2010); *see also* MERRIAM WEBSTER'S SECRETARIAL HANDBOOK 139 (3rd ed. 1993). The "speak-

er/hydrophone capability" at Column 3, lines 29 through 34, is also part of a longer paragraph discussing some thirteen options besides "the speaker/hydrophone capability."

▮ In sum, the principle of claim differentiation applies, and there is insufficient intrinsic evidence to overshadow the fact that the patentee omitted the limitation of operability as both a speaker and a hydrophone from claim 4, while including that limitation in claims 1 and 45. In light of claim differentiation,. a person of ordinary skill in the art would not understand the term "transducer element" in claim 4 to be capable of converting electrical energy to acoustical energy and vice versa.

### b. Whether "transducer element," or more is disposed within the watertight housing

After some discussion with counsel and the experts, the court proposed a construction that "transducer element" means "a component that converts electrical energy into acoustical energy, and which may be part of a device." Ct.'s Ex. 5b.

In objecting to the court's proposed definition, Plaintiff expressed concern with the phrase "a component" and explained that there was a dispute regarding whether the "transducer element" or the entire submersible device, of which the transducer element is a part, must be "disposed within the watertight housing." Plaintiff suggested that, because of this dispute, "transducer element" should be construed as "a part of a component . . ." rather than "a component" as suggested in the court's revised proposed definition (Ct.'s Ex. 5b). Defendants, of course, disagree.

Plaintiff's proposal, however, appears to be a roundabout means to obtain a construction of "transducer element" that would allow Plaintiff to argue that any part of a transducer, including a wire for instance, would then qualify as a "trans-

ducer element," and only that part must be disposed within a watertight housing in order to infringe. The court will not entertain Plaintiff's request for a construction that allows them, in the future, to pick and choose which parts of which components must be contained in the watertight housing in order to infringe.

Neither of the parties' proposed constructions at briefing suggested that either party sought a construction of the term "transducer element" that linked the term to its disposition within the watertight housing. So, while this dispute may be a live one for the court to resolve in the context of other terms or in the context of the accused product at summary judgment, it will not affect the court's construction of "transducer element."

Though Court's Ex. 5b contained "part of a device" language in construing this term, claim 4 itself states that the transducer element comprises at least part of the submersible device. *See* '395 Patent, 20:39–40. For the court to write in an additional limitation that the element be part of the device would therefore be redundant.

▮ In accordance with the foregoing discussion and after careful consideration of the parties' arguments, the court construes this term as follows:

> "transducer element" in the context of claim 4 means "**a component that converts electrical energy into acoustical energy.**"

▮ The court recognizes that one canon of construction is that words are presumed to have the same meaning in different claims. As noted above, Claims 1 and 45 include the term "transducer element," but both claims teach speaker and transducer capabilities. In its most basic form, a "transducer" converts one form of energy to another. *See* STEVE M. KAPLAN, WILEY

ELECTRICAL AND ELECTRONICS ENGINEERING DICTIONARY 798 (2004); IEEE 100: THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS 1198 (7th Ed. 2000). But that does not clarify the term for jurors when they are considering Claim 4.

### 3. "watertight housing"—'395 Patent, claim 4

This term appears in claim 4, which states in part (disputed term in bold): "a submersible device comprising a transducer element disposed within **a watertight housing**." '395 Patent, 20:39–40.

Plaintiff proposes the term means "an enclosure for preventing water from entering." Dkt. 61, at p. 15. Defendants suggest "a frame or box for containing something, the frame or box being so snugly put together that no water can get in or through." Dkt. 64, at p. 38.

The parties' experts, and in some cases the parties themselves, agreed on a number of facts relevant to this term. Based on these agreements and representations and upon the specification of the patent itself, the court makes the following findings of fact, which would have been known and understood by a PHOSITA as of the date of the invention:

8. "Waterproof" and "watertight," both of which appear in the specification, have different meanings. Tr. at 79:14–83: 7 (experts and court discussing differences in these terms).

9. "Waterproof" typically refers to a covering, such as a rain coat or the covering on a control panel that will keep out rain or splashed water. Tr. at 80:8–20; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2584–85 (2002)

10. "Watertight" refers to a covering or enclosure of such precision of construction or fit as to be impermeable to water except when under sufficient pressure to produce structural discontinuity by rupture. Tr. at 82–83; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2584–85 (2002)

11. "Watertight" does not require a seal, but a watertight enclosure may be created by a seal. Tr. at 80:21–81:16.

12. It is possible that a device may have both waterproof and watertight properties. Tr. at 83:10–84:3.

13. With a typical "out-of-the-box," low-end transducer, the transducer, at least to the point that the wire enters, it must be watertight. Tr. at 84:25–86:12. But, in the same device, the wiring leading up to a control panel that is external to the transducer need not be completely watertight. *Id.*

A person having ordinary skill in the art would understand that "waterproof" and "watertight" have different meanings. In the patent itself, there are several instances where "watertight" and "waterproof" both appear in describing the housing. *See* '395 Patent, 4: 29–30; *id.* at 10:16–18; *id.* at 10:19–20. This indicates that the patentee intended that these two words have different meanings. Webster's Dictionary, which defines the two terms differently (*see* findings 7 and 8 above), also comports with this interpretation. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2584–85 (2002). Both experts agreed that this was the case.

It is useful to discuss briefly the commonly-understood meaning of "watertight," the term that the court has been asked to construe, versus "waterproof." A cellphone case that is merely "waterproof" may prohibit water from entering, but if submerged in water, it may allow water to come into contact with electrical components, i.e. it would not be "watertight." An outboard engine on a boat may have a "waterproof" engine cover to keep water out of the gasoline engine, which sits above the water. But the lower unit of that out-

board motor, with the gears and drive shaft to the propeller, is intended to be submerged and would have to be "watertight" in order to prevent water from coming into contact with those components. *See* Tr. at 83–84 (court's discussion with experts of these examples).

It became clear at the *Markman* hearing that it is undisputed that "watertight" means impermeable to water, down to some design depth. Tr. at 88:11–23. Plaintiff abandoned its contention that all that is required in this construction is that the housing be merely waterproof. Tr. at 94:7–18. Based on the findings set out above, which were agreed upon by both experts, the crux of the dispute then is what is meant by the term "housing."

Defendants stated at the hearing that they were willing to abandon the part of their proposed definition that references "frame or box" based on their understanding that only some structure was required. Tr. at 89:8-18; *see also* Tr. at 92:14-17. Defendants also conceded that construction of the term "watertight housing" need not include what may be within the watertight housing. Tr. at 92:24–94:6.

The court proposed to the parties that "watertight housing" means

> "a casing, which can be an integral part of a transducer (like the casing of a watch), or which can be a container (like a camera case for underwater use) into which all or some part of a transducer is placed, and either way, the casing prevents water from coming into contact with the electrical components of the transducer when it is submerged."

Tr. at 94:22–95:7 (discussing Ct.'s Ex. 7). Both parties objected to this definition; however, those objections rest on non-infringement positions rather than proper claim construction principles or any of the intrinsic evidence.

Defendants objected that the phrase "which can be an integral part of a trans-

ducer" was confusing and counter-proposed with a definition that omitted that portion or any mention at all that the housing can be integral to the object that is encased. Tr. at 95:25–06:7; Tr. at 97:1–20. However, Defendants' own expert admitted that a casing that is integral to what is encased, like the casing of a watch, can be watertight. Tr. at 82:23–83:8. The court's proposal at Court's Ex. 7 is more helpful in explaining this to the jury.

Plaintiff objected to the definition at Court's Ex. 7 on the grounds that it improperly suggested that the "watertight housing" has to cover the entire transducer. Tr. at 100:15–101:3 (Pl. counsel discussing objections to Court's Ex. 7). Yet, Plaintiff cited no intrinsic evidence to support its position. Further, the definition proposed at Court's Ex. 7 does not improperly suggest what Plaintiff fears; instead, it states that all *or some* part of the transducer must be placed within the casing.

■ The court has revisited the briefing and arguments of the parties in light of findings of fact 8 through 13, to which the experts agreed at the hearing. Upon careful reconsideration, the definition originally proposed by the court appears to be needlessly complex. This is especially so, given that the phrase in which the disputed term located is simply "a transducer element disposed with a watertight housing." Accordingly, the court construes this term as follows:

> **"watertight housing" means "an enclosure or covering that is impermeable to water down to the depth at which it is expected to be used."**

### 4. "custom program"—'395 Patent, claims 4 and 13

This term is found in Claims 4 and 13. An exemplar from claim 4, with the term in bold, is: "sets of digitally prerecorded sounds, sequence and volume for user se-

lection of a **custom program.**" '395 Patent, 20:51–52.

Neither party contends that "program" is being used in the sense of a series of commands in a programming language used to direct the operation of a processor—a "computer program." Tr. at 23:23–24:3; Tr. at 167:7–18. Rather, "program" refers to a series of settings that

the user must select through the user interface.

"Custom program" as used in these claims requires that a user select, at a minimum, a sound and a volume setting. With an electronic media device such as an iPod, this might be similar to selecting a song from a play list and selecting a volume. This understanding comports with Figure 6 of the patent:

'395 Patent, Fig. 6 (excerpt, altered at relevant portions to enhance picture clarity); *see also* Ct.'s Ex. 8.

The block labeled as 605 in the above figure refers to user selection of a sound in the Normal Mode setting. *See* '395 Patent, 14: 51. Block 610 refers to user selection of a volume for that specified sound. *See id.* at 14:56–58. In either mode of operation that is described in the embodiment described in the patent, then, the program requires at least selection of a sound and volume. There is nothing in the patent to

suggest, as Plaintiff argues, that only a sound needs to be selected. The court will not eliminate selection of a volume when there is no competing intrinsic evidence to suggest otherwise. At the *Markman* hearing, Plaintiff was unable to provide any argument to the contrary. Tr. at 121: 1–23; Tr. at 128:12–16. There is likewise no basis to argue that the "custom program" is devoid of user input.

This understanding is supported by the prosecution history, where the inventor amended claim 4 from "pre-selected program" to "user-selected program" and inserted the language regarding user-selectable options:

4. (Currently Amended) A system for attracting and stimulating aquatic animals, said system comprising:

a submersible device comprising a transducer element disposed within a watertight housing; and

a programmable control unit operably connected linked to said submersible device, said programmable control unit comprising:

a processor;

a memory device operably connected to said processor, for storing a plurality of sets of digitally prerecorded sounds, at least some of which relate to sounds associated with aquatic prey; and

an input device including a user interface comprising a plurality of user-selectable options including said sets of digitally prerecorded sounds, sequence and volume for user selection of a custom program including one or more said sets of digitally prerecorded sounds in a specified sequence and at a specified volume, said input device is operably connected to said processor, for transmitting the user-selecting selected custom program including one or more of said plurality of sets of digitally prerecorded sounds to be played according to the user-selected custom program via said submersible device according to a the pre-user-selected program.

Dkt. 64–10 (Ex. J to Defs.' Brief, File history excerpt), at p. 4 (Bates BSX–001222).

Past the minimum requirements of user selection of a sound and a volume, however, the parties dispute the degree of customization required by the claims. They offered the competing proposals for a "custom program" below:

**Plaintiff's proposal:** "a specialized program" (Dkt. 61, at p. 17)

**Defendants' proposal:** "instructions specifying the operations to be performed for playing a made to order, newly configured combination of sets of digitally prerecorded sounds, which contains more instructions than playing a single sound file at a single volume (i.e. a 'normal' program). For example, a custom program could be: (1) playing every sound file in a list (i.e., Play All); (2) playing two or more sound files in a specified sequence (i.e. Select Sequence); or (3) playing a single sound file at a

single or variable volume with a specified delay (i.e., Play Selected Single Sound)." (Dkt. 64, at p. 20)

Neither of these proposals captures the meaning of "custom program" as it appears in claims 4 and 13, especially keeping in mind Figure 6 above. The court proposed a definition, which appears below and at Court. Ex.10:

"a selection of what is to be played made by the user choosing at least one of the sets of pre-recorded sounds and at least one volume level."

Addressed below are the three sub-issues to the parties' disputes over this term.

**a. Whether "custom program" requires importing limitations from the "Custom Mode" setting**

██ Defendants argue that the term "custom program" derives from the "Custom Mode" setting described in the specification, citing Column 14, lines 44–50, which describes the following four modes of operation for a single embodiment: (1) Normal

(2) Custom (3) Load, and (4) Save. *See also* '395 Patent, 14:66–16:61 (describing "Custom Mode" in detail). According to Defendants, because the specification describes "Custom Mode," the word "custom" is a term of art in the specification. Dkt. 64, at p. 19; *see also* Tr. at 113:13–114:6; Tr. at 133:18–22; Tr. at 114:15–21 (Defendants' arguments).

But the full statement describing "Custom Mode" continues: "if Custom Mode **615** is selected, the following options *may* be available . . . ." '395 Patent, 14:66–67 (emphasis added). Three options are listed: Play All, Select Sequence, and Play Selected Single Sound. *See* '395 Patent, 14:66–15:6. In that embodiment, "Custom Mode" is contrasted to "Normal Mode," which allows a user to "select a single sound and a single volume setting." '395 Patent, 14:51–52. Based on this description of the "Custom Mode" setting, Defendants propose that "custom program" requires a limitation that a user selects not only a sound and volume but also a sequence. Tr. at 125:24–127:18.

■■■ However, Defendants have not identified any intrinsic evidence that supports their assertion that the "Custom Mode" setting—which is specific to a single embodiment, and which says three options *may* be available—spells out a limitation that is to be read into the construction of "custom program." Generally, claims are not restricted to specific embodiments. *See Phillips*, 415 F.3d at 1323; *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1364 (Fed. Cir. 2004). Here, the specification explicitly states that the Custom and Normal Modes are "one embodiment of the present invention." *See* '395 Patent, 14:46. Even in that embodiment, the term "Custom Mode," not "custom program," is used. The court is wary of reading in limitations from a single described embodiment without more, especially when even that embodiment does not reference the

term that is to be construed—custom *program.*

To the extent that Defendants argue that "Normal Mode" was disavowed and the scope of the claims is limited to "Custom Mode" as a result of this disavowal (Dkt. 64 at pp. 19–21), the court finds insufficient intrinsic evidence that the patentee sought to limit the claimed inventions to only the embodiment described in the specification or that patentee sought to exclude the "Normal Mode" option. For similar reasons discussed later with regard to this same term (*see infra* Section 4.2), there was no clear and unmistakable disavowal in the prosecution history either. The court will not import limitations which derive solely from the "Custom Mode" option, as described in the specification, into the construction of "custom program."

### b. Whether a "custom program" excludes the playing of a single set of prerecorded sounds

■■■ Defendants also argue that "custom program" requires a limitation that a single sound file does not constitute a "custom program," because according to Defendants, Plaintiff disavowed claim scope during prosecution that covered playing a single sound file as a "custom program." Dkt. 64, at pp. 21–24. Plaintiff disagrees.

As Plaintiff properly pointed out during the *Markman* hearing, neither the patent nor the prosecution history include the term "sound file" anywhere; instead, both reference "prerecorded sounds." This, of course, does not resolve the underlying conflict, the root of which appears to be whether a "custom program" can be a single set of prerecorded sounds.

Next, nothing in the prosecution history elevates to a "clear and unmistakable" disavowal that would require the limitation that Defendants propose. Prosecution disclaimer applies only to "clear, unmistakable, and unambiguous disavowal." *Pur-*

*due*, 438 F.3d at 1136; *see also Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) ("[W]hile the prosecution history can inform whether the inventor limited the claim scope in the course of prosecution, it often produces ambiguities created by ongoing negotiations between the inventor and the PTO. Therefore, the doctrine of prosecution disclaimer only applies to unambiguous disavowals."). Defendants claim that clear and unmistakable disavowal occurred when patentee added "custom program" and other related language to distinguish the claims over the prior art. Defendants point to two instances: an amendment to claim 4 that changed "pre-selected program" to "user-selected program" and statements made in the patentee's remarks about that amendment. Neither the amendment or the patentee's related statements, even viewed in light of the totality of the prosecution history (which is the proper frame of reference under precedent like *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1378 (Fed. Cir. 2008)), amounts to clear and unmistakable disavowal.

The markup of the amendment upon which Defendants rely is below:

4. (Currently Amended) A system for attracting and stimulating aquatic animals, said system comprising:

a submersible device comprising a transducer element disposed within a watertight housing; and

a programmable control unit operably ~~connected~~ linked to said submersible device, said programmable control unit comprising:

a processor;

a memory device operably connected to said processor, for storing a plurality of sets of digitally prerecorded sounds, at least some of which relate to sounds associated with aquatic prey; and

an input device including a user interface comprising a plurality of user-selectable options including said sets of digitally prerecorded sounds, sequence and volume for user selection of a custom program including one or more said sets of digitally prerecorded sounds in a specified sequence and at a specified volume, said input device is operably connected to said processor, ~~for~~ transmitting the ~~user-selecting~~ selected custom program including one or more of said plurality of sets of digitally prerecorded sounds to be played according to the user-selected custom program via said submersible device according to a ~~the pre-~~user-selected program,

Dkt. 64–10 (Defs.' Brief Ex. J, Excerpt File History), at p. 4 (Bates BSX–001222).

While it is evident that the patentee added in the concept of user configuration, generally, to overcome prior art—a fact which became undisputed at the *Markman* hearing—there is nothing that suggests in the amendment itself that the patentee surrendered an embodiment that allowed a user to select only a single set of prerecorded sounds. In fact, the patentee did not strike the language following "selection of a custom program," which specifically allows for a program to consist of one set of digitally recorded sounds; with that language left in, claim 4 recites, in part, a "user-selected custom program including

*one or more* of said plurality sets of digitally prerecorded sounds." What was clearly unmistakably disavowed—embodiments that entirely exclude user configuration—is not disputed. This amendment does not support extending the disclaimer to the scope of that user configuration, let alone create disavowal of an embodiment where only one set of sounds was selected.

The court next addresses the statements made by patentee at the time of the amendment. While Defendants correctly point out that the patentee made several statements related to the "custom program" aspect of his inventions, there was, again, no clear and unmistakable disavowal that requires a limitation that a single set of sounds cannot constitute a custom program. The very statement to which Defendants point (below) does not disavow but actually suggests that the inventions cover user selection of a single set of prerecorded sounds. In discussing how the inventions differ from prior art, the patentee stated:

> "The alleged combination of [several references] at best disclose [*sic*] an interface for generating a plurality of sound and perhaps playing recordings but there is no disclosure of a user interface that includes a plurality of user-selectable options which include ... for user selection of a custom program which includes *one or more* sets of digitally prerecorded sounds in a specified sequence."

Dkt. 65–10 (Defs.' Brief Ex. J, Excerpt File History), at pp. 15–16.

In response to the amendment, the PTO never explained why the amended claims were allowed. Considering these two instances in light of the prosecution history as a whole, there was no clear and unambiguous disavowal of the user selection of a single set of prerecorded sounds.

Defendants' reliance on several Federal Circuit disavowal cases is unavailing. The reasoning in at least one case cited by Defendants, *Schindler Elevator Corporation v. Otis Elevator Company* (*see* Dkt. 64, at p. 28), actually supports applying disavowal only to the broader user configuration aspect and not to anything specific about the detailed options within a "custom program." 593 F.3d 1275, 1284–86 (Fed. Cir. 2010). The claimed inventions in *Schindler* concerned an elevator installation apparatus that contained an "information transmitter" that automatically transmitted information about a user's destination (floor-level) to a recognition device, without requiring a user to physically input his or her desired floor. *Id.* at 1278–80. While the Federal Circuit agreed that any apparatus that required a user to press buttons to actuate the transmitter was disavowed, it held that the district court improperly concluded from statements in the prosecution history, which described the invention as operating as "automatically, contactlessly [*sic*], and independently," that user input was entirely disavowed. *Id.* at 1285. The Federal Circuit rejected the notion that these statements disavowed user input from all aspects of the apparatus, such as bringing the transmitter within the range of the recognition device. *Id.* Therefore, the Federal Circuit, on review, actually modified the district court's constructions of terms, which it found had been improperly expanded.

Here, Defendants similarly seek exclusion of a feature that was not clearly and unambiguously the subject of amendment or any statements made related to that amendment. Just as the prosecution history in *Schindler* did not address the feature which one party sought to prove was disavowed, neither the amendment to claim 4 nor the statements made by the patentee or the PTO related to that amendment address the number of sets of sounds that a user may select to be played. As in

*Schindler*, where none of the prior art was distinguished based on the automatic, hands-free aspect of bringing the transmitter into range of the recognition device, none of the inventions here were distinguished over the prior art based on the number of sound sets to be played. To find disavowal here would therefore commit the same reversible error made by the district court in *Schindler*.[6]

While Claims 4 and 13 appear to have been amended to incorporate more user configuration options, this court does not find "clear and unmistakable disavowal" related to the scope of those options. Therefore, the court will not limit "custom program" to exclude playing of a single set of prerecorded sounds.

### c. Whether "custom program" requires user input of a sequence

Defendants also claim that, due to disavowal of claim scope, "custom program" requires user input of a sequence, in addition to selection of a sound and a volume. *See, e.g.*, Dkt. 64, at p. 24. Here too, Defendants' reliance on disavowal is misplaced.

██ Though the term "sequence" was added to claim 4 through the amendment discussed in the prior section, there was no "clear and unmistakable manifestation of the patentee's intent to surrender claim scope" for those embodiments where sequence is not user-configured. At the time of amending claim 4, the patentee inserted the word "sequence" along with several other changes. The mere fact that the insertion was made contemporaneously with other changes does not preclude it

from evidencing disavowal. *See Computer Docking*, 519 F.3d at 1377. However, because that insertion was accompanied by other amendments and there is no definitive statement that it was inserted to overcome prior art or the final rejection, the patentee's addition of the word "sequence" is ambiguous, or subject to more than one reasonable interpretation. There are no statements by patentee or PTO, for instance, that would lead one to conclude that patentability hinged on insertion of that phrase. The prosecution history therefore falls short of a true disclaimer. *See 01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012), citing *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) (an "ambiguous disclaimer, however, does not advance the patent's notice function or justify public reliance, and the court will not use it to limit a claim term's ordinary meaning.")

██ The specification actually suggests that the patentee intended to claim, not disavow, embodiments wherein user configuration of a sequence is not required. Where there may be ambiguity as to prosecution disclaimer, even under the cases cited by Defendants, courts may look to the specification to determine if any potential disavowal is rebutted by the description of the invention in the actual patent. *Computer Docking*, 519 F.3d at 1377 (concluding that there was nothing in the specification that undercut the applicant's clear disavowal of laptop computer because the specification never identified the laptop).

---

6. In another case cited by Defendants, *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003) (*see* Dkt. 64, at p. 22), the patentee had added two limitations through amendment in order to "gain allowance of the claims after almost twenty years of repeatedly unsuccessful attempts." *Id.* at 1333. Here, not only is there insufficient evidence to demonstrate that the exclusion of a single set

of sounds from a "custom program" was added to gain allowance, but there is no such pattern of rejection to support clear or unmistakable disavowal. Defendants cannot point to any evidence, let alone twenty years' worth of attempts to overcome prior art, that prior versions of the claims allowed for the playing of a single set of prerecorded sounds and the amended version does not.

Here, in the embodiment containing the "Normal Mode" option as described in the specification, a user need not select a sequence. *See* '395 Patent, 14:51–65; '395 Patent, Fig. 6, blocks 605 and 610. Defendants could not explain to the court during the *Markman* hearing why construction of "custom program" should ignore the fact that one embodiment in the specification specifically does not require user selection of a sequence. *See* '395 Patent Fig. 6; *id.* at 14:51–65.

While Defendants' proposal is excessively narrow, Plaintiff's proposal that a "custom program" is merely a "specialized program" is too broad in the context of the specification and the prosecution history. The plain language of claim 4 and even the embodiment described in the specification ("Normal Mode") require user selection of, at a minimum, a sound and a volume. '395 Patent Fig. 6; *id.* at 14:51–65. Plaintiff could not present evidence to the contrary. *See* Tr. at 121:1–22; Tr. at 128:12–16.

■ Both parties objected to the court's proposed definition at Court's Ex. 10 based on their arguments above. In accordance with the foregoing discussion and after careful consideration of the parties' arguments objections, the court overrules those objections and adopts this construction:

"custom program" means "a selection of what is to be played, made by the user choosing at least one of the sets of pre-recorded sounds and at least one volume level."

### 5. "sets of digital sounds" & "sets of digitally prerecorded sounds"—'395 Patent, claims 4 and 13

These terms are found in Claims 4 and 13. An exemplar use from claim 4 (the term bolded) is: "a memory device operably connected to said processor for storing a plurality of **sets of digitally prerecorded sounds**." '395 Patent, 20:45–47. Another exemplar is as follows: "a custom program including one or more of[7] said sets of **digitally prerecorded sounds**." *Id.* at 20:52–54.

At the *Markman* hearing, the parties substantially agreed with the definition proposed at Court's Ex. 11:

"sets of digital sounds" and "sets of digitally prerecorded sounds" mean "groups of sounds that have been previously recorded digitally."

Ct's Ex. 11. Plaintiff's only objection was that the construction did not account for the fact that multiple sets could comprise a single group rather than multiple groups; Plaintiff therefore proposed that the first word of the construction should be "group" rather than the plural form "groups." Tr. at 140:17–141:7. Defendants did not object. Tr. 141:8–21. Changing "groups" to "group" in the above proposition comports with the intrinsic evidence, so the court adopted that as part of its construction.

Defendants' objection was that the definition did not include the negative limitation that merely playing "sets of digital sounds" cannot be a "custom program." Tr. at 141:8–14. But Defendants, during discussion of a prior term at the hearing,

---

7. There is a typographical error in claim 4 ('395 Patent, 20:53) of the patent that this court, pursuant to *Novo Industries, LP v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003), has the authority to correct. At the *Markman* hearing and through a subsequent filing, all parties agreed to this correction and that it was a clerical error that could be properly corrected by this court. Tr. at 118–120; Dkt. 79. Based on this, the court hereby inserts the word "of" between the words "more" and "said" at Col. 20, line 53 of the '395 Patent.

could not, and have not since, provided any authority to support its position that a court should import a negative limitation in the construction of terms like this. Tr. at 17:23–19:2. Moreover, Defendants' argu-ments rest on the supposition that Plaintiff disavowed certain aspects of what entailed a "custom program" during prosecution history; the court refuses to read in that type of limitation for the same reasons articulated with regard to Defendants' arguments about "custom program." *See supra* Section 4.2.

 After consideration of the parties' arguments, the court adopts the following construction:

> **"sets of digital sounds" and "sets of digitally prerecorded sounds" mean "a group or groups of sounds that have been previously recorded digitally."**

### 6. "an underwater transducer device"/ "an underwater transducer"—'395 Patent, claim 13

These terms appear in claim 13. An exemplar in context (disputed term in bold) is: "executing the custom program by transmitting to **an underwater transducer device**, signals for playing the one or more sets of digitally prerecorded sounds." '395 Patent, 21:44–46.

Only Defendants seek construction of these terms, which they contend have the same meaning (*see* Dkt. 64, at p. 41). Plaintiff urges that the terms' plain and ordinary meanings control (*see* Dkt. 65 (Reply), at pp. 16–17). Defendants concede that, in claim 13, the terms "underwater transducer device" and "underwater transducer" have the same meaning as "submersible device," which appears on its own in claims 1, 4, and 45. Tr. at 142:12–24; 144:2–19.

Based on the same arguments that Defendants made with regard to "transducer element," Defendants argue that "transducer" or "transducer device" should have

dual speaker and hydrophone capability. Dkt. 64, at pp. 41–42. The court's construction of "transducer element" rejects Defendants' proposed limitation that the element of claim 4 be capable of operating as a hydrophone. For reasons similar to those stated in the context of construing "transducer element," the court refuses to read in that limitation in the context of this claim term.

Defendants also posit that the construction of this term ·should reflect that the entire "transducer" or "underwater transducer device" has a watertight housing. Dkt. 64., at pp. 42–43. However, in the context of claim 13, the only place where either of these terms appear, the term "watertight housing" never appears. Moreover, this aspect of the parties' dispute is resolved by the court's construction of "watertight housing." What the claims require be disposed within the watertight housing is the "transducer element." Because the claims and the specification are silent as to whether the entire transducer device is also disposed within the watertight housing, the court will not read in such a limitation.

Based on Defendants' concessions at the *Markman* hearing, it is evident that Defendants' request, at base, is a request for the court to construe "underwater" in a way that makes it easier for Defendants to argue in the future that the entire "transducer device'" must be within "watertight housing" in order to infringe. However, again, the term "watertight housing" does not appear in claim 13. Moreover, the court has construed "transducer element" as used in Claim 4, noting that Claim 4 does not teach hydrophone capabilities, while other claims do. The court has found, as a matter of fact, what a transducer device is as understood by a PHOSITA. *See supra*, Finding of Fact 1. There is no reason to give a separate definition for the

term "underwater" outside of the plain and ordinary meaning for this term. To adopt Defendants' definition would improperly import limitations from claim 4 into claim 13.

■■■ The terms "**an underwater transducer device**" and "**an underwater transducer**" are given their **plain and ordinary meaning** as understood by a PHOSITA in light of Finding of Fact 1, upon which the parties' experts agreed.

### 7. "specified sequence"—'395 Patent, claims 4 and 13

This term appears in both claims 4 and 13. An exemplar in context from claim 13 is (claim term in bold): "manually selecting from the user interface menu a custom program including one or more of[8] said sets of digitally prerecorded sounds in a **specified sequence** and at a specified volume." '395 Patent, 21:35–38.

Plaintiff proposes that this term should be given its plain and ordinary meaning. Dkt. 65 (Reply), at p. 17. Defendants propose that "specified sequence" means

> "sequence entered by the user of two or more sound files. For example, selection as described in the "Select Sequence" mode. However, playing a single sound file is outside the scope of the claim."

Dkt. 64, at p. 30. In other words, Defendants seek a construction that specifies that the user must select the sequence and the number of items in that sequence. Plaintiff disagrees.

A sequence may consist of a series of repetitions of the same item. Tr. at 147:9–22 (Plaintiff's characterization). In other words, if set of sounds A was played repeatedly in the sequence such as A, A, A,

then that would constitute a sequence. If the sequence is a repetition of the same set of sounds, that same set of sounds must be played at least twice in order to constitute a sequence. Tr. at 154–155.

After hearing from Defendants at the *Markman*, the court proposed the following definition, found at Court's Ex. 13:

> "specified sequence" means "the order in which the pre-recorded sets of sounds are chosen by the user to be played; however if the user chooses to play only one set of sounds the order would necessarily be a repetition of the same set of sounds."

Ct.'s Ex. 13. Plaintiff objected to this construction based on its contention that it excludes the possibility that a "specified sequence" may be factory preset rather than user-configured. Under Plaintiff's interpretation of the claim language, it is undisputed that a user selects the custom program, but that custom program may include sounds that are preset in their "specified sequence" at a factory beforehand rather than by the user. Plaintiff does not deny that a user may specify the sequence but insists that user input of a sequence is not required. Tr. 151:22–152:7.

Defendants agreed that the proposed construction (Ct.'s Ex. 13) properly captured the fact that a "specified sequence" must be specified by the user. Tr. at 154:16–25. But Defendants objected that the construction at Court's Ex. 13 did not specify that a "specified sequence" requires having two or more different sound files being played or that playing one set of sounds on repeat would not constitute a "specified sequence." *Id.* Defendants pointed to three portions of the patent to sup-

---

**8.** Pursuant to *Novo Industries,* 350 F.3d at 1357, the court hereby corrects a clerical error in the patent that occurs at claim 13, '395 Patent, 21:36. This is identical to the clerical error that was corrected, and agreed-upon by

the parties, in claim 4 (*see supra* note 8). The same exact language appears again in claim 13. The court hereby inserts the word "of" between the words "more" and said" at Col. 21, line 36 of the '395 patent.

port their contention that a "specified sequence" cannot be a repetition of sets of sounds and required two or more different sound "files" (Tr. at 155:9–15 (citing Tr. at 149:20–151:12)): (1) the "Play All" option of one embodiment described in the specification, (2) the "Select Sequence" mode of that embodiment wherein, according to Figure 7, note 3, the user picks two or more sounds; and (3) the "Sound Sweep" mode of the embodiment, where a user picks two or more (sets of) sounds. According to Defendants, these all described sequences which require picking two or more different sound files to be played. Discussion of these settings in the specification, according to Defendants, disavow claim scope that covers playing one sound file in a sequence.

Defendants' argument once again conflates "sound file," a term that does not appear in the patent or the prosecution history, with "prerecorded sounds" or "set of sounds." It is inappropriate to import the term "sound file" in construction just because a sound file is relevant to the accused device —such a construction would, in effect, improperly prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327 (Fed. Cir. 2006).

All three portions of the specification identified by Defendants focus on details describing a single embodiment from the specification. But, in focusing on those portions, Defendants ignore the claim language of the asserted claims. Claim 4 explicitly calls for "one or more said sets of digitally prerecorded sounds . . . in a specified sequence." *See* '395 Patent, 20:48–54. Because the parties agree that a sequence can be an order of uniform things, this language explicitly claims one set of sounds played repeatedly is a "sequence." The court refuses to read out that possibility by importing limitations from various statements about a single embodiment.

■ Having considered the parties' arguments, the court construes the term as follows:

> "specified sequence" means "the order in which the pre-recorded sets of sounds are chosen by the user to be played; however, if the user chooses to play only one particular set of sounds, that same set of sounds must be played at least twice, and the order would necessarily be a repetition of the same set of sounds."

8. "user-selectable options including said sets of digitally prerecorded sounds, sequence"—'395 Patent, claims 4 and 13

This term appears in both claims 4 and 13. An exemplar from claim 4 is (term in bold): "an input device including a user interface comprising a plurality of **user-selectable options including said sets of digitally prerecorded sounds, sequence** and volume for user selection of a custom program." '395 Patent, 20:49–52. In Claim 13, the term appears as: "an input device including a user interface comprising menu of a plurality of **user-selectable options including said sets of digitally prerecorded sounds, sequence** and volume."

Here again, only Defendants seek construction of this term, requesting the following construction: "options that allow a user to select the sequence of two or more sets of digitally prerecorded sounds to be played." Dkt. 64, at p. 17. Based on similar arguments they made with regards to "specified sequence," Defendants posit that the "input device" in claim 4 has to have a specific user-selectable option that includes sequencing. *Id.* at 18. Defendants again point to the claim language and the prosecution history for support. *Id.* at 18–20. According to Defendants, Plaintiff disa-

vowed picking a single sound set from digital memory as a "user-selectable option including . . . sequence" through the prosecution history and the specification. *Id.*

As previously stated, the court rejects the notion that prosecution disclaimer applies to limit the scope of the user-selectable options. *See supra* Section 4.2 (discussion of "custom program" term). As reasoned before, there was never a clear, unambiguous, and unmistakable disavowal made with regards to which options were included in the user interface or the scope of those options. Without clear and unambiguous disavowal, Defendants cannot rely on prosecution disclaimer to limit these claim terms.

Importantly, wherever the phrase "user selectable options including . . . sequence" appears in claims 4 or 13, it is followed by language that expressly references the term "specified sequence," a term which is construed above. *See, e.g.,* '395 Patent, 20:49–54 (claim 4); *id.* at 21:29–38 (claim 13). Because the parties' dispute here arises from their differing interpretations as to what is involved in specifying a sequence, the court's construction of "specified sequence" resolves the dispute underlying "user selectable options including . . . sequence." Therefore, the court will not cloud the claim language with further construction.

■ The term **"user-selectable options including said sets of digitally prerecorded sounds, sequence"** is given its **plain and ordinary meaning** as understood by a PHOSITA in light of the court's construction of other terms in the patent.

### 9. "transmitting the user-selected custom program"—'395 Patent, claim 4

Only Defendants seek construction of this term, which is found only in claim 4 as follows (term in bold): "said input device is operably connected to said processor for

**transmitting the user-selected custom program** including one or more of said plurality of sets of . . . sounds." '395 Patent, 20:55–57. Defendants propose the following construction: "sending or transmitting the user configured custom program created at, and residing in, the input device." Dkt. 64, at p. 48.

Defendants' main contention is that the court should limit this term so that the "transmitting" referenced within it occurs in one direction, from the input device to the processor and the memory device. Tr. at 158:20–162:15. At the *Markman* hearing, Defendants vaguely stated that their support for the proposed direction draws from the "context of the claims." Tr. at 161:13–16. However, that vague representation is insufficient to convince the court that the claims recite a direction for the transmitting. As the court pointed out at the hearing, the plain language of the claim renders it more logical that the input device actually draws *from* the memory device, where the sounds are stored, rather than transmitting anything *to* that memory device. Tr. at 160:16–161:11. Defendants' construction distorts the claim language.

In light of the court's construction of other terms in the patent, there is no need to construe the term **"transmitting the user-selected custom program.**

### 10. "user selection"—'395 Patent, claim 4

■ Only Defendants seek construction of "user selection," which appears in claim 4 as follows (term in bold): "**user selection** of a custom program." '395 Patent, 20:52. Defendants propose that the term means "user physically making a selection." Dkt. 64, at p. 49. Importantly, however, it is undisputed that the user, not anyone or anything else, operates the user interface. Tr. at 163:13–14 (D's ad-

mission); Tr. at 164:23–165:9 (P's admission). In responding to the court's very pointed question as to why Defendants sought construction of this term if there was no dispute, Defendants made clear that they sought construction of this term to clarify their indefiniteness position:

> "Your Honor, I will give you a very specific reason why we construe what you just characterized what we believe is the proper construction, to require a user making a physical selection. This is a system claim. There is very clear case law from the Federal Circuit that says if you include in a system claim something that requires a user action, a user physically selecting something, then that creates a significant indefinite issue between combining system claims that require user action. We believe the claim is invalid for that reason we want a very clear [construction]."

Tr. at 164:4–15.

The purpose of claim construction is not to provide one side a silver bullet for a future claim-dispositive summary judgment argument. Given that the parties do not actually dispute the meaning of this term, the court will not construe this term. As ordered below, any indefiniteness arguments should be presented by motion no later than **30 days from the date of this Order**.

11. **Executing terms: "said submersible device is responsive ... to execute" ('395 Patent, claim 4) and "executing the custom program" ('395 Patent, claim 13)**

Only Defendants seek construction of these terms. Dkt. 64, at pp. 49–50. However, there is no support from either the patent or the specification to construe these terms as anything but having their plain and ordinary meaning. Defendants' arguments consist of a pathetically paltry, poorly punctuated paragraph in their brief

and do not recite a single piece of intrinsic evidence. *See* Dkt. 64, at pp. 49–50. After the court pointed this out at the *Markman* hearing, Defendants withdrew their requests for construction of both these terms. *See* Tr. at 168:14–22.

## VI. CONCLUSION

The jury will be instructed in accordance with the court's interpretation of the disputed claim terms in the '395 patent.

It is ORDERED that any indefiniteness arguments should be presented by motion from Defendants **no later than 30 days from the date of this Order**.

So **ORDERED** and **SIGNED** this 17th day of **January, 2017**.